Filed 4/29/13  P. v. Wolfe CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C063232 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F04297) |
| v. | |
| MARTIN PARKER WOLFE et al., | |
| Defendants and Appellants. | |

This case involves the forcible rapes in 2000 of a developmentally disabled woman, Raquel Doe (Raquel), by defendants Martin Parker Wolfe and Scott Michael Cherms.  They were not tried and convicted until 2009 when DNA evidence obtained from Raquel was matched with DNA from the defendants.  Each was convicted of one count of the forcible rape of a developmentally disabled woman and one count of the aiding and abetting of the forcible rape in concert of a developmentally disabled woman based on the view that Raquel by virtue of her mental condition was legally incapable of

1

giving consent to sex. (Pen. Code §§ 261, subd. (a)(1), 261, subd. (a)(2), 264.1.)[1]  In the same proceeding Wolfe was also tried and convicted of the 1997 forcible rape in concert of Candy Doe (Candy).[2]

The jury acquitted both Wolfe and Cherms of acting as a perpetrator in the rape in concert of Raquel and of raping an intoxicated person, Raquel.  The jury was unable to reach a verdict on the charge they were perpetrators of a forcible rape of Raquel.  The trial court declared a mistrial as to those counts.  As a consequence, the convictions of rape were predicated solely on Raquel's legal incapacity to consent to sex.[3]

Defendants raise numerous issues on appeal.  They seek to exploit confusion in the testimony of Raquel about the events of the rape and challenge the evidentiary support of her legal incapacity to consent to sex.  Defendant Cherms challenges the jurisdiction of the court to try him under the juvenile law existing at the time of the offense, since he was 17 years old when he raped Raquel in January 2000, 24 years old at the time of his arrest in 2007, and 26 years old at the time of trial.  The only issue of merit relates to the sentence imposed for defendants' subordinate term for the rape in concert of Raquel.  We shall remand the case for resentencing on count 4, but shall otherwise affirm the judgments.

---

[1]  Further references to an undesignated code are to the Penal Code, unless otherwise indicated.

[2]  Cherms pleaded no contest to a charge of corporal injury to a spouse.  (§ 273.5, subd. (a).)  No issues as to that crime are raised in this appeal.

[3]  The trial court sentenced Cherms to 16 years in prison, and sentenced Wolfe to 26 years in prison.

FACTUAL AND PROCEDURAL BACKGROUND

A. Sexual Assault of Raquel

Raquel has been a client of the Alta California Regional Center, which provides services to the developmentally disabled, since she was born. She has been diagnosed with moderate mental retardation and epilepsy, and has a history of seizures.

At the time of the trial, Raquel was 35 years old, and lived with her two children, ages two and four, and her partner. She was not capable of raising a child without help. Her mother took care of her finances. Raquel also had two older children. One lived with Raquel's mother, and one had been adopted by Raquel's sister.

Linda M., Raquel's mother, testified that Raquel went to a friend's house on January 18, 2000, with her cousin, Cassandra Doe (Cassandra). Cassandra was not related to Raquel, but Raquel referred to Cassandra as her cousin. They left in the early evening, while it was still daylight.

When the girls did not return in the time Linda M. had told them to return, she went looking for them, but could not see them anywhere. Sometime later, after getting a phone call from the girls, Cassandra's mother left and came back with the girls. Both girls were crying and had grass in their hair and tears in their clothing. Linda M. could smell alcohol on Cassandra's breath. Cassandra appeared very drunk, could not stand up, and was vomiting. Raquel, too, smelled as if she had been drinking. Raquel was on medication for her seizures, and was not supposed to drink alcohol. Raquel was also feeling a little sick, but was not vomiting. The only thing Raquel told Linda M. was that she had been raped. Linda M. called the police. They came and took a report, and both girls were taken to the hospital.

The details of Raquel's account of the incident varied. She told her story five separate times.

1. Raquel's Testimony

Raquel testified at the trial. She said that she and Cassandra went to the park with six boys she did not know, but whom Cassandra knew. She said she drank one beer, but she did not know what was inside the beer. She testified that one of the boys dragged her to the gutter, then he went after Cassandra. She said that one of them forced her, and put his penis in her vagina. He was a White guy. She saw Cassandra on the grass with people on top of her. She heard Cassandra say she needed help, and Raquel tried to go help her. After the boy ran away, Raquel helped Cassandra up and they walked to a neighbor's house to get help. When they got home she felt dizzy, but Cassandra was "kind of drunk."

2. Raquel's Statement to Officer Prizmich

Officer Dennis Prizmich responded to the 911 call regarding the sexual assault of Raquel and Cassandra. Raquel told Prizmich that they were sitting in the park with the six boys, talking and drinking for about three hours. When the girls said they had to get home, all of the boys grabbed both of them and dragged them to the back of the park near the fence. Two or three of the males pushed Raquel through a hole in the fence along the creek. One of the two White males, a Mexican male, and Joe (who was one of the Black males) held her down on the ground. The White male held her arms and the Mexican male and Joe pulled her pants, panties, and shoes off. The Mexican male tried to get between her legs, but Joe (the Black male) got there first. She told them to stop, but they would not.

After Joe finished with her, he climbed up the embankment and went over to where the others had Cassandra on the ground. Raquel got dressed and went toward Cassandra. She saw a White male with blond hair between Cassandra's legs. Cassandra did not have on any pants or panties, and was saying she needed help. The guys said they had better go before the cops showed up, and they all took off running.

4

Raquel helped Cassandra get dressed, and tried to get her up and walking, but she could not walk. Cassandra kept saying she felt dizzy and needed to sit down. They finally got to a house, where Raquel asked to use the telephone. Raquel called Cassandra's mother, who came to pick them up. Cassandra was having a hard time breathing, and her mother took her to the hospital. Officer Prizmich took Raquel to the medical center for a rape exam.

3. Raquel's Statement to the Nurse

Raquel told the nurse who examined her that she had been given Kool-Aid, which she later found out contained vodka. She said she felt drunk after drinking the Kool-Aid. She also said that two people out of a group of at least four assaulted her. She said all four were African-American males. She reported only one of them had penetrated her vagina with his penis. She claimed that in addition to vaginal penetration, one of the males' penises had penetrated her rectum. She claimed one of the assailants made her orally copulate his penis and one of the assailants orally copulated her anal area. She was also made to masturbate one of the assailants, after which he ejaculated on his own leg.

Raquel reported that her tailbone hurt from being pushed onto the concrete, and her clothes were wet. She had scratches on her arms and soreness to her vaginal area. She also had some superficial anal tearing.

The nurse took oral, vaginal, rectal, and cervical swabs from Raquel. These, plus Raquel's underwear and blood samples were sent to the county crime lab.

4. Raquel's Multi-Disciplinary Interview Center Interview

Approximately one month after the attack, on February 17, 2000, Raquel was taken the multi-disciplinary interview center, where her interview was videotaped. The videotape was played for the jury. She told the interviewer that six boys had been at the park, and she named Nathan, Tony, and Scott. She told the interviewer that the person who touched her "private" was Tony, and that he put his finger inside her. Tony took his

5

pants off and put his penis inside her vagina. She stated that no one else had touched her. She said Scott raped Cassandra.

5. Raquel's Statement to Detective McBeth-Childs

Sophia McBeth-Childs met Raquel for the first time on May 9, 2006, when McBeth-Childs was working as a detective in the Sacramento County Sheriff's Department. Raquel told McBeth-Childs that she remembered drinking three wine coolers, and that she had felt drunk. Raquel reported that when she and Cassandra said they had to go, "they" dragged her to the creek area and the guys held her down.

Raquel gave McBeth-Childs more identifying characteristics of her attacker whose name was Joe. She said he was husky and kind of heavy, which was why she had been unable to get him off of her. She also said he was shorter than she, and that he seem young -- 17 or so. She thought he was half Black and half White. She said he smelled like "weed" and had a tattoo on his upper right arm. She also thought he had braces.

B. Sexual Assault of Candy (against defendant Wolfe)

Candy testified that she reported being raped on May 9, 1997. She was living in North Highlands at the time. She was headed home on her bicycle after buying a cup of coffee at 7-Eleven around 4:00 a.m., when she cut though a field behind a shopping center. She ran into two African-American males she did not know, who asked her for a cigarette. She stopped, got off her bike, and gave them a cigarette. They introduced themselves as Marty (later identified as defendant Wolfe) and Jeff. They tried to persuade her to go home with them and "do a line" of crank, but she refused.

Marty came up behind her and caught her neck in the crook of his elbow as she was talking to Jeff. Marty told her she needed to lie down and cooperate, or they would "take" it from her. She was terrified, and perceived they meant to rape her. She begged them to let her go, and told them they could have her bike and the money in her pocket.

6

Marty took off her pants and underwear. He tried to take off her shirt, but she prevented it. Both Marty and Jeff had intercourse with her. Neither used a condom. Each watched while the other raped her. After they both finished, they walked away.

Candy went to a Chevron station, where someone called the sheriff's department for her. When the officers arrived, Candy took them to where the attack occurred. There they found Candy's comb, sunglasses, and cup of coffee. Candy described her attacker to the officers. She identified defendant Wolfe (Marty), and testified he looked pretty much the same then as now.

Candy was taken to a hospital, where she was examined. Swabs were collected from her cervix and vagina. There were nonmotile (nonmoving) sperm in the specimen collected from her vagina. She had abrasions on her back and bruising on her leg. There was vegetation around her vaginal area. There were no injuries inside or outside the vagina, but this was not inconsistent with rape.

Nothing happened with her case until 2007 when she was contacted by Sacramento County Sheriff's Detectives Bradley Jones and Sophia McBeth-Childs. They showed her a photographic lineup. She immediately recognized defendant Wolfe.

The detectives were able to link Candy's case with Raquel's 2000 sexual assault case by DNA evidence, although they were unaware to whom the DNA belonged until late 2006. There were two victims in the 2000 case: Raquel and Cassandra. Both Raquel and Cassandra were contacted, but Cassandra was the only victim that knew some of the suspects involved. Because she was unwilling to cooperate, the detectives had to close the case in May 2006.

C. Investigations After DNA Hit

McBeth-Childs testified that she had made attempts to locate and talk to Cassandra, but that Cassandra had been uncooperative. This initially affected her decision not to move forward with the case in 2006. Then, in December of 2006, she was advised that there had been a DNA hit identifying defendant Cherms. Raquel was then

7

shown a photographic lineup containing Cherms's picture. She did not identify Cherms. On a different day, McBeth-Childs showed Raquel a photographic lineup containing defendant Wolfe's picture. Raquel also did not identify Wolfe.

The detectives engaged in a series of telephone calls with Cherms, which were recorded and played for the jury. The detectives met with defendant Wolfe on February 28, 2007. They met in a parking lot at Wolfe's request, stayed in their respective vehicles, and talked to each other through the open car windows. The interview was recorded, and the recording was played for the jury. During the interview, the detectives showed Wolfe several photographs, including Raquel and Cassandra. Wolfe identified both girls, but did not know their names. At the meeting, the detectives asked Wolfe to provide a DNA sample, but he refused. They later obtained a search warrant for a buccal swab.[4]

In April 2007, the detectives contacted defendant Cherms while he was in jail on another charge. After discussing the case with him, they realized they had not given him his *Miranda* warnings.[5] They went back to the jail, *Mirandized* him, and talked to him a second time. Recordings of both interviews were played for the jury.

The detectives showed Cherms several photographs, including photos of Raquel and Cassandra. He recognized Cassandra, and knew her by name. He said at first he did not recognize Raquel, but later acknowledged she had been there in the park.

D. DNA Evidence

McBeth-Childs testified that in March and April, 2007, she collected buccal swabs from Wolfe and Cherms. She sealed the envelopes containing the swabs, and sent them to the crime lab.

---

[4] A buccal swab is a long cotton swab used to take a sample of a person's DNA by collecting saliva from between the person's cheek and gum.

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

8

Deven Johnson, a criminalist in the DNA section of the Sacramento County District Attorney's crime laboratory, testified. Johnson testified that she did DNA testing on Raquel's underwear, and examined her vaginal and rectal swabs. She also did the reference samples for Raquel, Wolfe, and Cherms.

From Raquel's underwear, Johnson extracted a sperm and nonsperm profile. The nonsperm fraction was consistent with Raquel's DNA profile. The sperm fraction was a mixture of two males. Johnson was able to split the mixture into a major contributor and a minor contributor. This means that sperm from one of the contributors was present in greater quantities than the sperm from the other contributor.

The major contributor was consistent with defendant Cherms's DNA profile. The probability of that profile occurring at random in the Caucasian population (Cherms is White) is 1 in 24 quintillion. The minor contributor was consistent with defendant Wolfe's DNA profile. Only a partial profile was possible on the minor contributor. The probability of that profile occurring among unrelated individuals in the African-American population is 1 in 10 trillion. The probability of the profile occurring among unrelated individuals in the Caucasian population is 1 in 2 trillion, and the probability of it occurring in the Hispanic population is 1 in 150 trillion.

Johnson also examined the vaginal and rectal swabs taken from Raquel. She found some sperm on the vaginal swabs. After subtracting out Raquel's DNA profile, there was a mixture of two individual's DNA. The major contributor was consistent with Cherms (probability of 1 in 6 quintillion of the Caucasian population). The minor contributor, again a partial profile, was consistent with Wolfe (probability of 1 in 700 billion African-Americans, 1 in 160 billion Caucasians, and 1 in 1 trillion Hispanics). There was sperm on the rectal swab, but the quantity was insufficient to develop a profile.

Kristen Bejarano, another criminalist in the DNA section of the Sacramento County District Attorney's crime laboratory, testified. She analyzed a DNA sample taken

9

from Candy's underwear. The nonsperm fraction from the underwear was the same as Candy's reference DNA sample. The sperm fraction from the underwear was the same as the profile from Wolfe's reference sample. The probability of the sperm fraction's DNA profile occurring at random in unrelated individuals was 1 in 28 quadrillion of the African-American population, 1 in 4 quadrillion of the Caucasian population, and 1 in 520 quadrillion of the Hispanic population.

Bejarano also tested DNA collected from Candy's vaginal and cervical swabs. The vaginal swab contained a mixture of at least three individuals. After subtracting Candy's DNA profile, Bejarano found the remaining profile was a mixture of two males. Bejarano subtracted Wolfe's DNA profile as well. The person who donated the third DNA sample was unknown at the time of trial. As to the mixture of sperm DNA off of Candy's vaginal swab, 1 in 30 million African-American, 1 in 3 million Caucasians, and 1 in 5 million Hispanics would be included in the mixture. The results of the cervical swab were nearly identical.

## DISCUSSION

### I
### Evidence of Raquel's
### Incapacity to Consent to Sex

Wolfe argues there was insufficient evidence that Raquel was rendered incapable of giving consent because of her developmental disability.[6] Wolfe points to the fact that by the time of the incident, Raquel had already given birth as a result of sexual relations with her boyfriend. In essence, he argues that since Raquel had engaged in consensual sex, she could not be incapable of consenting. We disagree.

In addressing this claim of insufficient evidence we review the whole record in the light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

---

[6] Cherms joins in this claim.

10

"We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 139.) We determine whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560, 573].) Unless it is clear that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

"The existence of capacity to consent is a question of fact. [Citation.] A lay juror is able to assess the extent of a victim's mental disability. ' "The question whether a person possesses sufficient resources—intellectual, emotional, social, psychological—to determine whether to participate in sexual contact with another is an assessment within the ken of the average juror, who likely has made the same determination at some point." [Citation.]' [Citation.] 'There is a nationwide consensus that expert testimony on this issue is not required. [Citations.]' [Citation.]" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1413-1414.)

Early on, the Supreme Court defined legal consent as "an intelligence capable of understanding the act, its nature, and possible consequences. This degree of intelligence may exist with an impaired and weakened intellect, or it may not." (*People v. Griffin* (1897) 117 Cal. 583, 585, overruled on another point in *People v. Hernandez* (1964) 61 Cal. 2d 529, 536.) In *People v. Griffin, supra*, the Supreme Court determined that evidence the victim "had been feeble-minded since early childhood" was sufficient to support a finding that she was incapable of giving legal consent. (*Id*. at p. 587.)

Raquel testified at trial, so the jury was able to see and hear her, and assess her demeanor. Her demeanor was highly probative of her mental condition. (*People v.*

11

*Miranda, supra*, 199 Cal.App.4th at p. 1414.) Relative to her consent, Raquel testified that the males dragged her and forced her, and that she "didn't want to do it." She said, "I didn't want to get forced." When asked what she did not want to be forced to do, she replied: "I didn't know they were going to do it."[7] She was asked if she said anything when she was penetrated, and her response was that she was scared. She was asked, "Did you want them to do that to you?" She responded, "No."

When Raquel's mother testified about her disability, she said, "she is developmentally delayed. She can't write; she can't read. She can sign her name. . . . She knows how to distinguish the A, B, C's but she can't put the letters together. [¶] She lives independently with the help of Alta, STEP, and myself."[8] Raquel's mother testified that Raquel could not drive, and had never had a job. Prior to the incident, Raquel had sought and received her mother's permission to date her boyfriend, Fernando, and to have a child with him.

Raquel required her mother's assistance with grocery shopping, and her mother would take her to her appointments to explain things, because Raquel "doesn't understand very well." Raquel's mother did her banking for her and made sure her bills were paid. Raquel could not drive. At the time of trial, she lived independently with two of her children, but she had her mother's assistance, as well as the services of an independent living instructor. She would not be capable of raising children without help.

She was capable of responding to questions with simple words and phrases, but was not able to pick up the thread of a conversation and continue it. She could prepare very simple meals, like eggs or macaroni.

---

[7] It is at least ironic that Wolfe argued at trial Raquel was not competent to testify, and he now argues she was competent to consent to having sex with him.

[8] STEP is a parenting support group that provides an independent living instructor.

Raquel had the following exchange on the witness stand with Cherms's trial counsel:

"Q. Okay.

"Do you -- if I ask you what rape means, could you tell me?

"A. No.

"Q. I'm sorry?

"A. No.

"[¶] . . . [¶]

"Q. Okay. Let me ask you this.

"[¶] . . . [¶]

"You have one child by Fernando; right -- your old boyfriend?

"A. Yeah.

"Q. Okay. When you had sex with Fernando was that rape?

"A. No.

"Q. Okay. Do you -- do you -- does that help you to know the difference between what is and what isn't rape?

"A. No.

"Q. No. Okay. You are still not sure what rape is?

"A. No.

"Q. Okay. Did -- did Cassandra tell you to use that word -- to use the word rape --

"A. No.

"Q. -- in describing what happened?

"A. No.

"Q. Where did you get that word?

"A. I didn't know it was going to happen that night."

The fact that Raquel was unable to explain the concept that rape involves sex without consent is evidence from which the jury could reasonably infer that she was not able to give legal consent.

The jury was aware that Raquel had four children as a result of consensual sexual relations. The fact that she was able to consent in other circumstances does not mean that she was capable of giving legal consent at the time of the incident here. " 'It is important to distinguish between a person's *general* ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation.' [Citation.]" (*People v. Thompson* (2006) 142 Cal.App.4th 1426, 1440.) Raquel's story was that she was forced to drink alcohol, forced into a canal by six males, that her clothes were removed, that it was late at night, and that she was scared. Under these particular circumstances, the jury could reasonably infer her inability to give legal consent.

The jury saw Raquel on the stand, and heard testimony from her mother and her service coordinator at the Alta California Regional Center regarding the extent of her developmental disability. We do not reweigh the evidence on appeal. The evidence was sufficient for the jury to reasonably infer that Raquel did not have the capacity to give legal consent at the time the acts were committed.

## II
### Instruction on Legal
### Capacity to Consent

During deliberation, the jury sent a series of requests relating to Raquel's ability to consent. The court answered the requests with the agreement of the prosecutor and both defense counsel. The questions and answers were as follows.

The jury asked: "Is a developmentally disabled adult lawfully able to give consent?" The court answered: "It depends on the evidence. Whether Raquel was at the time and in the situation shown by the evidence incapable of giving legal consent because

14

of developmental disability is a question for the jury to determine based on all the evidence presented in the trial. [¶] Under the law, 'consent' is defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily, and have knowledge of the nature of the act involved. [¶] Legal consent presupposes intelligence capable of understanding the act, its nature, and possible consequences. This degree of intelligence may exist with an impaired and weakened intellect, or it may not. Whether Raquel had such a degree of intelligence under the circumstances shown by the evidence in this case is a question of fact for the jury."

The jury asked: "When it says [a] developmentally disabled individual is not legally able to give consent, is that negated because the developmentally disabled adult was previously able to decide to have a child in other circumstances?" The court answered: "A developmentally disabled woman's prior pregnancy, even if it resulted from a conscious and considered decision to have a child, does not necessarily establish ability to give legal consent. Whether a woman is legally unable at the time and in the situation shown by the evidence to consent to an act of sexual intercourse with a particular person or persons is for the jury to determine based on all the evidence. [¶] Whether a developmentally disabled woman previously became pregnant may be a factor in determining whether the woman was able to understand the act of sexual intercourse, its nature, and the possible consequences of a decision to participate in an act of sexual intercourse. For example, it may imply that the developmentally disabled woman understood the possibility of impregnation, though it may not necessarily imply that the woman understood that sex could result in disease or other heath consequences."

The jury next asked: "Does that fact alone [i.e., that the victim was previously able to decide to have a child in other circumstances] demonstrate the developmentally disabled adult is competent to give consent in this set of circumstances?" The court answered: "The weight to be given evidence of a prior pregnancy of a developmentally disabled woman is for the jury to determine."

15

The jury finally asked: "Does she have to say 'no' to demonstrate she did not give consent?" The court answered: "No. Resistance by the victim is not required to prove commission of any of the forms of rape charged in counts 1-6. [¶] It is a crime to have sex with a person who is so developmentally disabled as to be incapable of giving legal consent, provided that is known or reasonably should be known to the person committing the act. This is true even if the victim appeared to consent."

Wolfe argues that the definition of "consent" given by the trial court (i.e., consent is defined to mean positive cooperation in act or attitude pursuant to an exercise of free will, and the person must act freely and voluntarily, and have knowledge of the act involved) is the definition taken from Penal Code section 261.6, and that while this definition applies to forcible rape (§ 261, subd. (a)(2)), it does not apply to section 261, subdivision (a)(1), rape of a disabled person.[9]

Wolfe denominates consent as defined in section 261.6 "actual consent" and claims that it is distinguishable from the "legal consent," of which a developmentally delayed person is incapable. Wolfe does not explain the difference he perceives between the two species of consent. He claims the trial court's erroneous instruction, "undermined the prosecution's burden of proof, infringed on the jury's fact-finding function, [and] violated appellant's Sixth Amendment jury trial guarantee and Fourteenth Amendment Due Process right to a fair trial . . . ." The argument is meritless.

Section 261.6 states that it applies "[i]n prosecutions under Section 261, 262, 286, 288a, or 289, in which consent is at issue . . . ." Rape of a developmentally disabled person under section 261, subdivision (a)(1), is undeniably a prosecution under section 261. It is also a prosecution in which consent is at issue to the extent the jury must determine whether the victim was capable of giving it.

---

[9] Cherms joins in this claim.

16

### III
### Fitness Hearing

Defendant Cherms was 17 years old when he raped Raquel in January 2000. He was 24 years old at the time of his arrest in 2007, and 26 years old at the time of trial.

When the crime occurred, section 602, subdivision (a), of the Welfare and Institutions Code stated in pertinent part:

> "Except as provided in subdivision (b), any person who is under the age of 18 years when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state . . . is within the jurisdiction of the juvenile court, which may adjudge the person to be a ward of the court."

Subdivision (b) is not applicable to Cherms, thus subdivision (a) is the applicable subdivision.

Welfare and Institutions Code section 707, subdivisions (b) and (c), provide that where a person described in Welfare and Institutions Code section 602, was 14 years of age or older at the time the person was alleged to have violated certain offenses, including forcible rape, "upon motion of the petitioner made prior to the attachment of jeopardy the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for a determination of unfitness." (Welf. & Inst. Code, § 707, subd. (c).) Following submission of this report, the juvenile court makes a determination of fitness, and the person is "presumed to be not a fit and proper subject to be dealt with under the juvenile court law[,]" unless there is evidence of extenuating or mitigating circumstances based on the following criteria: "(1) The degree of criminal sophistication exhibited by the minor[;] [¶] (2) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction[;] [¶] (3) The minor's previous delinquent history[;] [¶] (4) Success of previous attempts by the juvenile court to rehabilitate the minor[; and] [¶] (5)

The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (*Ibid.*)

On September 13, 2009, prior to jury voir dire, the trial court indicated that in preparing for the case, it had discovered that Cherms was 17 years old on the date of the offense. The court stated it assumed there was a waiver of a fitness hearing. Cherms's attorney indicated that Cherms wanted a fitness hearing. The trial court expressed its opinion that it was "extremely unlikely that Mr. Cherms would be found fit to stay within the jurisdiction of the Juvenile Court, given his age now, his criminal record, [and] the nature of the charge against him in the sexual assault case . . . ." The court further stated its opinion that the trial could go forward and the fitness hearing could be conducted after the trial. The court expressed reluctance to send Cherms to juvenile court because codefendant Wolfe had a right to a speedy trial.

The trial court made the decision to proceed to trial with both defendants, finding there had been a failure to object to adult court jurisdiction in a timely manner. The court also stated that Proposition 21[10], which was enacted a few months after the offense, would have given the prosecutor the right to file the case against Cherms directly in adult court. The court indicated it thought Proposition 21 acted prospectively, since it related to the procedure to be followed, and that the case against Cherms could be direct-filed even though the crime was committed before the passage of Proposition 21.

The prosecutor indicated she believed Cherms was entitled to a fitness hearing. She specifically stated that although some portions of Proposition 21 might be more

---

[10] Proposition 21 amended Welfare and Institutions Code section 707, subdivision (d), to give a prosecutor the discretion to prosecute a minor either in criminal court or in juvenile court when the minor is alleged to have committed a specified crime at a specified age--including defendants' ages and the crimes they committed. (Prop. 21, as approved by voters, Primary Elec. (Mar. 7, 2000).)

procedural in nature, the aspect that allowed the district attorney to direct-file cases in adult court creates ex post facto issues, and would not be applied retroactively.

After the verdicts were returned, the trial court requested that the probation department prepare a fitness report, evaluating Cherms under the appropriate fitness criteria set forth in Welfare and Institutions Code section 707. The report found: (1) Cherms displayed a significant degree of criminal sophistication, making him unfit for juvenile court under the first criteria; (2) because Cherms was over the age of 25, he could not be rehabilitated prior to the expiration of juvenile court's jurisdiction, making him unfit under the second criteria; (3) Cherms had a relatively minor juvenile delinquency history prior to the offense, thus was found fit under the third criteria; (4) because Cherms's prior criminal record was insignificant, previous attempts by the juvenile court to rehabilitate him would be considered successful, thus he was fit under the fourth criteria; and (5) the circumstances and gravity of the offense rendered him unfit under the fifth criteria. The report concluded Cherms was unfit for juvenile court.

The trial court adopted the findings and conclusion of the probation report, stating that "to insist on a formal fitness hearing, as is conducted in the Juvenile Court, would elevate form over substance in this particular instance."

Cherms claims the trial court erred in failing to send the case to juvenile court for a fitness hearing, and that the adult court lacked jurisdiction to proceed in the absence of a fitness hearing. As a result, he claims this court is required to reverse his convictions on counts 3 and 4.

Respondent argues: (1) Cherms waived his right to trial in juvenile court by failing to raise the issue in a timely manner; (2) direct-filing of charges in the superior court did not violate ex post facto laws because Proposition 21, which took effect after Cherms committed the instant offenses and which authorized a prosecutor to file criminal charges directly in adult court without a prior fitness hearing, amounted to a procedural

change that was outside the reach of the ex post facto clause; and (3) any error was harmless beyond a reasonable doubt.

We agree with Cherms that his request for a fitness hearing was timely raised and was not waived. However, because we shall conclude that any error was harmless, we need not determine whether the prosecutor could have relied on Proposition 21 to direct-file the charges in adult court.

A defendant may waive the right to be tried as a juvenile by failing to object in a timely fashion. (*Jose D. v. Superior Court* (1993) 19 Cal.App.4th 1098, 1101.) Respondent stresses the fact that Cherms did not raise the question of age until two years and four months after the charges were filed against him. However, Welfare and Institutions Code section 707, which governs the fitness hearing at issue states in pertinent part:

> "In any case in which a minor is alleged to be a person described in subdivision (a) of Section 602 by reason of the violation, when he or she was 16 years of age or older, of any criminal statute or ordinance except those listed in subdivision (b), *upon motion of the petitioner made prior to the attachment of jeopardy* the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for a determination of unfitness. . . ." (Welf. & Inst. Code, § 707, subd. (a)(1), italics added.)

The statutory language sets forth the time limit for bringing a motion for a fitness hearing. This defines the timeliness of the motion. By statute, a motion is timely if it is made before the attachment of jeopardy. Jeopardy attaches when the jury is sworn. (*People v. Riggs* (2008) 44 Cal.4th 248, 279, fn. 12.)

Cherms indicated to the trial court on September 13, 2009, that he would not waive his right to a fitness hearing. Jury voir dire began on August 18, 2009. Cherms did not waive his right to a fitness hearing. Nevertheless, the failure to obtain a formal juvenile court fitness determination was harmless error.

The California Constitution provides: "[n]o judgment shall be set aside . . . in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) A " 'miscarriage of justice' should be declared only when the court . . . is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Failure to hold a fitness hearing does not result in the superior court's lack of subject matter jurisdiction, but instead results in an excess of jurisdiction. (*In re Harris* (1993) 5 Cal.4th 813, 838-840.) A court acts in excess of jurisdiction "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.)

Where the irregularity is not jurisdictional in the fundamental sense, it is subject to a harmless error analysis. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [failure to allow public preliminary hearing was not jurisdictional in the fundamental sense, and was reviewed under appropriate standard of prejudicial error]; *In re Wright* (2005) 128 Cal.App.4th 663, 673.)

This court has applied a *Watson*[11] harmless error analysis in similar circumstances, holding that " 'a "miscarriage of justice" should be declared only when the court . . . is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]"

---

[11] *People v. Watson* (1956) 46 Cal.2d 818.

(*People v. Villa* (2009) 178 Cal.App.4th 443, 453 (*Villa*).)  In *Villa*, we held that a failure to conduct a fitness hearing under subdivision (c) of section 1170.17 was subject to analysis for harmless error.  (*Villa, supra,* at pp. 452-453.)  That subdivision provided that under certain circumstances, a juvenile charged and tried in criminal court was subject to disposition under juvenile court law unless the district attorney demonstrated the person was unfit to be dealt with under juvenile court law.  (*Id.* at p. 451.)

*Villa* held that the trial court erred in not requiring the district attorney to file and prevail on a motion under section 1170.17, subdivision (c), before sentencing the defendant in criminal court.  (*Villa, supra,* 178 Cal.App.4th at p. 451.)  We recognized that the failure to hold a Welfare and Institutions Code section 707 fitness hearing was jurisdictional, but stated that the defendant had not shown that the failure to hold a fitness hearing under section 1170.17 was jurisdictional.  (*Villa, supra,* at p. 453.)  However, we also stated that the defendant did not "explain how, even if such a failure were jurisdictional in nature, it overcomes the harmless error analysis compelled by the California Constitution."  (*Ibid.*)

It is not reasonably probable Cherms would have obtained a more favorable result had he obtained a formal determination from the juvenile court, because it is not reasonably probable he would have been found fit for treatment in juvenile court. Because a charge of forcible rape was alleged against Cherms, and because he was 14 years of age or more at the time of the offense, he would have been "presumed to be not a fit and proper subject to be dealt with under the juvenile court law . . . ."  (Welf. & Inst. Code, § 707, subd. (c).)

In evaluating his fitness for treatment as a juvenile, the court would have considered the degree of his criminal sophistication, whether he could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, his previous delinquent history, the success of previous attempts to rehabilitate him, and the circumstances and gravity of the offenses alleged against him.  (Welf. & Inst. Code, § 707, subd. (c).)  As stated, the

probation report determined that Cherms was unfit under every factor except his previous history and the previous attempts to rehabilitate him. Significantly, by the time Cherms advised the trial court that he would assert his right to a juvenile fitness hearing, the juvenile court's jurisdiction had already expired because of his age. The chances of his being rehabilitated before the juvenile court's jurisdiction expired was zero.

Cherms admits, "[t]here can be no argument that based solely on the nature of the offenses charged in count 1 through 6 (or now, based solely on the nature of the convictions obtained on those counts), appellant would have been found an unfit subject for juvenile court adjudication." Cherms nevertheless argues that had a juvenile court fitness determination been made, it would have been required to consider his criminal history and his parents' comments about his social history.

Even though the probation report required prior to a fitness hearing "is intended to inform the juvenile court of matters material to the issue of fitness other than the types of offenses allegedly committed[,]" there was no miscarriage of justice here. (*Raul P. v. Superior Court* (1984) 153 Cal.App.3d 294, 299-300.) A probation report was prepared that concluded Cherms was unfit for treatment as a juvenile. This report considered Cherms's history as well as the charges against him. Also, as indicated, there was no chance that Cherms could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, since Cherms did not assert his right to a fitness hearing until after he turned 25. Cherms's history as a juvenile was insufficient to overcome the presumption against his treatment as a juvenile. It is not reasonably probable he would have been declared fit to be treated as a juvenile. The error was harmless.

IV
Refusal to Provide DNA

Defendant Wolfe argues that the trial court erred in failing to grant his motion to exclude from evidence his refusal to voluntarily submit to giving a DNA sample. The trial court ruled that the prosecution was within its rights to present evidence of Wolfe's

23

refusal, to show a consciousness of guilt. Wolfe argues that his unwillingness to provide a sample was an assertion of his Fourth Amendment right to be free of an unreasonable search and seizure, and that his invocation of this Fourth Amendment right was protected by the Fifth Amendment privilege against self-incrimination, and was therefore improper to prove consciousness of guilt.

Respondent agrees that the testimony concerning Wolfe's refusal to consent should not have been admitted, but argues any error was harmless beyond a reasonable doubt. We agree that the evidence of Wolfe's refusal to volunteer a DNA sample was harmless beyond a reasonable doubt. Therefore, we need not address the merits of his claim.

The jury found Wolfe guilty of the rape and the rape in concert of Raquel, a disabled person, and the forcible rape in concert of Candy.

As to Raquel, the jury was instructed it must find: (1) defendant had sexual intercourse with a woman, (2) they were not married to each other, (3) the woman had a developmental or physical disability that prevented her from legally consenting, and (4) defendant knew or should have known the disability prevented the woman from consenting.

The admission of Wolfe's refusal to volunteer a DNA sample related only to the first element -- whether he had sexual intercourse with Raquel. The only reason Wolfe could have had for refusing to give a DNA sample was to prevent the discovery that he had sex with Raquel. None of the other elements of the offense reasonably could have been inferred from a DNA match. The fact that Wolfe did have sex with Raquel was proven beyond a reasonable doubt by the DNA evidence.

Although Wolfe attempted to argue he did not have sex with Raquel, the argument was weak, and was belied by the fact that his DNA was found in samples from Raquel's underwear and vagina. The DNA from Raquel's underwear and vaginal swab provided evidence beyond a reasonable doubt that Wolfe did have sexual intercourse with Raquel.

24

Wolfe's trial counsel attempted to argue that: (1) none of the DNA found on Raquel was the same as Wolfe's, (2) the criminalist's statistical analysis was flawed, and (3) the criminalist could not even tell whether the DNA from Raquel's vaginal swab was male or female.

However, the criminalist (Johnson) admitted that the DNA sample that was consistent with Wolfe's DNA profile was a partial profile, but that she was nevertheless able to estimate that the probability of that partial profile occurring among unrelated individuals in the African-American, Caucasian, and Hispanic populations was 1 in 10 trillion, 1 in 2 trillion, and 1 in 150 trillion, respectively. The DNA sample did not exactly match Wolfe's DNA profile *only* because the sample did not produce a complete profile. Even with the partial profile, Johnson was able to determine to a statistical certainty that Wolfe deposited the DNA sample taken from Raquel. The chances of someone else being the depositor of the DNA was so remote that the jury could not have found he did not have sexual intercourse with Raquel.

Although Wolfe's counsel attempted to cast doubt on her statistical methods, Johnson maintained that her statistical analysis was correct, and Wolfe did not submit any contrary expert testimony. Thus, Wolfe presented no evidence from which the jury could have found fault with Johnson's methods.[12]

Finally, Wolfe's trial counsel made much of Johnson's statement at the preliminary hearing that she was unable to determine from the profile alone whether a partial profile consistent with Wolfe's profile was male or female. But the partial profile

_____

[12] Wolfe attempted to cast doubt on Johnson's statistical calculations with the introduction of a paper by Dr. Bruce Budowle, a population geneticist. In the paper, Dr. Budowle recommended against the particular statistical analysis performed by Johnson. However, Johnson testified that she spoke to Dr. Budowle about that point, and that he stated the analysis was correct, but cautioned against using the method if it is not explained properly to the jury. Johnson stated that during her direct exam, she correctly explained the analysis to the jury.

25

was from the sperm fraction of the sample. Thus, it may be assumed reliably that the DNA was male.

The DNA evidence against Wolfe in the Raquel rape was so strong that the exclusion of the fact that Wolfe refused to volunteer a DNA sample would not have made the jury any less likely to conclude that Wolfe did not have sex with Raquel.

As to the forcible rape of Candy, the jury was instructed the elements were: (1) defendant had sexual intercourse with the victim, (2) he and the victim were not married to each other, (3) the victim did not consent, and (4) the intercourse was accomplished by force, violence, duress, menace or fear of immediate and unlawful bodily injury. As with Raquel, the failure to agree to volunteer a DNA sample related only to the first element.

Wolfe did not argue that he did not have sex with Candy, only that the sex was consensual. Because Wolfe's defense assumed he had sex with Candy, and his refusal to give DNA related only the fact that he had sex with Candy, it would have made no difference if his refusal to consent had been excluded.

The DNA samples from Raquel and Candy were consistent with the validly obtained DNA sample from Wolfe. The statistical probability that Wolfe's DNA was the same as the samples from Raquel and Candy was sufficient to prove beyond a reasonable doubt that Wolfe had sexual intercourse with both Raquel and Candy. Thus, the admission of his refusal to submit to DNA testing was harmless beyond a reasonable doubt.

V

DNA Evidence Did Not Violate Confrontation Clause

In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314] (*Melendez-Diaz*), the United States Supreme Court held that laboratory reports that are created specifically to serve as evidence in a criminal proceeding are testimonial for confrontation clause purposes, and the prosecution may not introduce such a report

26

without offering a live witness competent to testify to the truth of the report. (*Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610, 615].)

In *Melendez-Diaz,* the prosecution had introduced certificates of analysis showing the results of a forensic analysis performed on the substance found in the possession of the defendant, and stating that the substance was cocaine. (*Bullcoming v. New Mexico, supra*, 564 U.S. at p. ___ [180 L.Ed.2d 610, 618].) The court reasoned that the Sixth Amendment guarantees a defendant's right to confront those who bear testimony against him, and that certain extrajudicial formalized testimonial material made for use at a later trial constitutes the functional equivalent of ex parte, in-court testimony. (*Id.* at p. ___ [180 L.Ed.2d 610, 618-619].) Thus, the reports were not admissible absent a showing that the analysts who wrote the reports were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them. (*Id*. at p. ___ [180 L.Ed.2d 610, 615].)

In this case, a 1997 report was written by Jeff Herbert attesting that he found acid phosphatase and spermatozoa on vaginal and cervical swabs from Candy. The prosecution did not call Herbert as a witness, and Wolfe now argues the DNA testimony given by Bejarano, who performed the DNA analysis on the materials collected from Candy, violated his Sixth Amendment right to confront the witnesses against him.

Wolfe overlooks a crucial point. Herbert's report was not evidence in the case. No witness testified as to the contents of the report. Bejarano did not mention Herbert's report, nor did she indicate she relied on Herbert's report when performing her analysis. Very simply, there can be no confrontation clause violation when there is no testimony to confront.

## VI
### Sentencing

The trial court deemed Wolfe's conviction for the rape of Candy the principal term. The trial court determined the two counts involving Raquel were subordinate

27

terms. The trial court determined Cherms's conviction for rape of Raquel, a developmentally disabled person was his principal term, and the conviction for rape of Raquel in concert was the subordinate term.

Unless otherwise provided by law, the determinate sentencing statute provides that the subordinate term shall be one-third the middle term of imprisonment for the conviction. (§ 1170.1, subd. (a).) The trial court sentenced Wolfe to a full, separate, and consecutive term of eight years for the offense of rape in concert of Raquel (count 4), pursuant to section 667.6, subdivision (d). The trial court sentenced Cherms to a separate, consecutive mid-term of seven years for the subordinate term of rape in concert of Raquel (count 4).

Defendants argue that their sentences for the subordinate terms in count 4 should have been one-third the mid-term, as provided in section 1170.1. Instead, the trial court sentenced defendants pursuant to section 667.6, subdivision (d), which provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."[13]

The crime of rape of a disabled person is not one of the offenses specified in subdivision (e) of section 667.6. Respondent concedes the imposition of a full consecutive sentence pursuant to section 667.6, subdivision (d), was improper. The middle term for rape of a disabled person is six years, and one-third of that is two years. (§ 264, subd. (a).) This was the proper sentence for count 4. We shall remand for resentencing.

---

[13] The trial court made the finding as to each defendant that the crimes involved a separate occasion.

28

## Sufficiency of Evidence of Aiding and Abetting

Count 3 charged Cherms as the perpetrator and Wolfe as the aider and abettor in the rape in concert of a disabled person, Raquel.  As to that count, the jury found Cherms not guilty of rape in concert, but guilty of the lesser offense of rape of a disabled person.  Also as to that count, the jury found Wolfe guilty as the aider and abettor in the rape in concert of a disabled person.

Count 4 charged Wolfe as the perpetrator and Cherms as the aider and abettor in the rape in concert of a disabled person, Raquel.  The jury found defendant Wolfe not guilty of rape in concert, but guilty of the lesser offense of rape of a disabled person, and found defendant Cherms guilty of aiding and abetting in the rape in concert of Raquel.

Cherms argues, with Wolfe joining in, that the verdicts are inconsistent, and that the evidence was not sufficient to sustain their convictions for aiding and abetting rape in concert of a developmentally disabled person.

We need not determine whether the verdicts are inconsistent, because as defendants readily concede, a conclusion that the verdicts are inconsistent does not of itself warrant reversal.  (*People v. Lewis* (2001) 25 Cal.4th 610, 656.)  "An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*Ibid*.)  Instead, defendants make the limited argument that there is insufficient evidence to sustain the verdicts finding them guilty of aiding and abetting rape.  They claim that Raquel's various versions of events cannot establish that either of them encouraged, assisted, or facilitated the other in raping Raquel.

When a defendant challenges the sufficiency of the evidence, our task is to determine "whether ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  Credibility determinations are for the trier of fact alone.  (*Ibid*.)  The jury may believe

part of a witness's testimony and disregard the rest. On appeal, we must accept the part of the witness's testimony that supports the judgment. (*In re Daniel G*. (2004) 120 Cal.App.4th 824, 830.)

The jury was instructed:

"Someone aids and abets a crime if he knows the perpetrator's unlawful purpose and he specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.

"However, the fact that a person is present at the scene of a crime or fails to prevent a crime does not by itself make him an aider and abettor."

Although the details of Raquel's story changed from telling to telling, she consistently told a story of being with Cassandra at a park. While there, a group of males forced her to drink alcohol, then forced her down by the canal. She was raped and she saw Cassandra being raped. She remembered being raped by only one person, who was variously named Joe or Tony, and was White or African-American. The jury learned from DNA evidence that both Cherms, who was White, and Wolfe, who was African-American, deposited DNA inside Raquel.

The jury could have concluded that the very fact that each defendant raped Raquel could have encouraged the other to proceed with the act. Additionally, Raquel told Officer Prizmich, the first person to interview her, that "all of the guys" grabbed both her and Cassandra and dragged them to the back of the park near the fence. She also testified that there were six "boys" and that "they" forced her and Cassandra "to drink with drugs and stuff." This was sufficient evidence from which the jury could conclude that each had aided, facilitated, promoted, encouraged or instigated the other's commission of rape.

30

## VIII
## CALCRIM No. 400

Cherms argues the trial court erred when it instructed the jury pursuant to CALCRIM No. 400 that an aider and abettor is equally guilty of the charged offense. Wolfe joins in the argument.

Defendants argue that an aider and abettor's guilt may be less that the perpetrator's if the aider and abettor has a less culpable mental state. Defendants cite, inter alia, *People v. McCoy* (2001) 25 Cal.4th 1111, 1120, which held that an aider and abettor may be guilty of a more serious crime than the perpetrator if the aider and abettor's mens rea is more culpable. Following the reasoning of *People v. McCoy, supra*, the Court of Appeal for the Second District has held that an aider and abettor may be found guilty of a *lesser* offense than the perpetrator. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165.) We conclude the claim of error is forfeited, and that any error was harmless.

In discussing jury instructions, the trial court asked whether any of the attorneys had any objection to CALCRIM No. 400. Each one replied that they did not. At the end of the discussion, the trial court asked each attorney whether they had requested any instructions that were not included in the final draft. They each indicated there were not.

Thereafter, the jury was instructed:

> "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator who directly committed the crime.

> "A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."

31

Defendants did not seek clarification of this instruction.**14**

This court recently held that because the instruction "was generally accurate, but potentially incomplete in certain cases," it is incumbent on the defendant to request a modification if it is misleading on the facts of the case, and that "failure to do so forfeits the claim of error." (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119.)

Moreover, any error was harmless beyond a reasonable doubt. The reason courts have held CALCRIM No. 400 may be misleading in "exceptional circumstances" is that the jury may convict an aider and abettor of the same offense as the perpetrator, even though the aider and abettor had a less culpable mental state. (*People v. Nero* (2010) 181 Cal.App.4th 504, 517-518.) The liability of an aider and abettor must be assessed according to his or her own mens rea. (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1164.) If the offense is a specific intent offense, " ' "the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' " ' [Citation.]." (*Ibid.*)

Here, the jury sent the following question regarding the aider and abettor's mens rea to the trial court during deliberations: "As for the statement 'the defendant knew that the perpetrator *intended* to commit the crime' can we please elaborate on this statement? We have a question on what Intended means."

The court responded by referring the jury to CALCRIM No. 401, and elaborating that the aider and abettor must "know of and share the perpetrator's intent to commit the unlawful sexual acts charged in this case. [CALCRIM No.] 401 provides some elaboration on that concept in the next paragraph: 'Someone aids and abets a crime if he *knows the perpetrator's unlawful purpose . . . .*' " The court then used an example of a

---

**14** CALCRIM No. 400 has been revised to delete the word "equally" from the second paragraph.

getaway driver, and told the jury the driver would not know what the perpetrator intended if the perpetrator merely asked the driver for a ride to the bank to make a lawful withdrawal, and the driver had no reason to believe a robbery would occur.

CALCRIM No. 401, which was given to the jury, instructed them that a person "aids and abets a crime if he knows the perpetrator's unlawful purpose and he specifically intends to and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime. The crime at issue in this case was rape in concert.

These instructions thoroughly apprised the jury of the mens rea required on the part of the aider and abettor. Therefore, any error in also telling the jury that an aider and abettor is equally guilty of the perpetrator's crime was harmless beyond a reasonable doubt.

IX<br>Corroboration of Accomplice Testimony

Cherms argues the trial court erred in failing to sua sponte instruct the jury that it could not convict upon the testimony of an accomplice unless the testimony was corroborated by other evidence connecting him with the commission of the offense, and in failing to caution the jury that Wolfe's testimony required corroboration. We need not determine whether the trial court's failure to instruct was error, because any error was harmless.

Section 1111 provides:

> "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

> "An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Although Wolfe did not testify, Cherms contends one of Wolfe's out-of-court statements to police somehow implicated Cherms in the offense of aiding and abetting Wolfe in the crime of rape in concert.[15] The jury heard a recording of an interview between Wolfe and the detectives. It is the following exchange that Cherms claims implicated him in the crime of rape in concert as an aider and abettor of Wolfe:

"M. WOLFE: I slept with a lot of girls, man.

"DET. CHILDS: How about girls you didn't know?

"M. WOLFE: I don't know. I've had some strange encounters, you know?

"DET. JONES: What do you mean by strange?

"M. WOLFE: Just different stuff. (Unintelligible).

"DET. CHILDS: You ever had a threesome?

"M. WOLFE: Yeah, I've had a threesome before.

"DET. CHILDS: With a White girl?

"M. WOLFE: With White girls, Black girls.

"[¶] . . . [¶]

"DET. CHILDS: Who -- who's the other guy?

"M. WOLFE: Just homeboys.

"DET. CHILDS: Where -- where do these things happen? At motels or --

"M. WOLFE: No, at houses, you know what I mean?

"DET. CHILDS: Does that happen in the park?

_____

[15] Defendant Wolfe joins in any of Cherms's arguments that inure to his benefit. Because we fail to see how this claim inures to his benefit, we do not address the argument as to Wolfe.

"M. WOLFE:  No.  Why -- why would you go to the park to have a threesome?

"DET. CHILDS:  Or fields?

"M. WOLFE:  (Inaudible)

"DET. JONES:  Threesomes are pretty strange.  They don't happen all the time.  How many times have you --

"M. WOLFE:  Are you serious?

"DET. JONES:  Uh-huh.

"M. WOLFE:  God, that's -- it's regular like, you know?

"DET. JONES:  Do you think it's regular?

"M. WOLFE:  Yeah.

"DET. JONES:  Well, how many times have you had a threesome?

"M. WOLFE:  A bunch of times.

"DET. CHILDS:  Even in your current condition?[16]

"M. WOLFE:  No, not now.

"DET. JONES:  When's the last time?

"M. WOLFE:  It's been a while, man.  I -- I dated my last girl for like a whole year, and I've been with my girl right now for a year and a couple months.  So it's been a while, man, since -- since anything like that's happen, you know?

"DET. JONES:  You ever had a threesome with a stranger?

"M. WOLFE:  Just partying, man, you know what I mean?

"DET. JONES:  So all your threesomes with strangers have been at -- at parties?

---

16 Earlier in the interview, Wolfe told the detective that he had gained about 100 pounds over the last two years, and weighed 350 pounds.

"M. WOLFE:  No.

"DET. JONES:  No?

"M. WOLFE:  No.

"DET. JONES:  You ever had a threesome in a park?

"M. WOLFE:  (No audible response)

"DET. JONES:  In a field?

"M. WOLFE:  (No audible response)

"DET. JONES:  No?"

Prior to this discussion, Wolfe told the detectives he had never had sex with anybody in a park or in a field, except his ex-girlfriend.

Any error in failing to instruct the jury on consideration of accomplice testimony constitutes state-law error, and is not prejudicial unless it is reasonably probable that the error affected the verdict.  (*People v. Williams* (2010) 49 Cal.4th 405, 456.)  Assuming Wolfe's statement can be viewed as evidence that Cherms was guilty of aiding and abetting him in the rape in concert of Raquel, any error in failing to instruct the jury that it could not convict Cherms on Wolfe's statement alone unless it was corroborated with other evidence tending to connect him with the commission of the crime, or in failing to instruct that accomplice testimony required corroboration was harmless.  Failure to give such instructions is not prejudicial where there is sufficient evidence independent of the accomplice's testimony to connect the defendant to the charged offense.  (*People v. Frye* (1998) 18 Cal.4th 894, 965-966, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In this case, as indicated, Cherms was connected to the crime by DNA evidence, and by Raquel's statements that all of the males in the park with her and Cassandra dragged them to the back of the park by the fence and forced her to drink.  All of this was greater evidence of Cherms's guilt than was Wolfe's statement.  Had the trial court given

36

the instructions regarding accomplice testimony, it is not reasonably probable the verdict would have been different.

X
Limiting Instruction on Uncharged Sexual Acts

Cherms argues, with Wolfe joining, that the trial court erred when it failed to give CALCRIM No. 1191, which limits the use the jury may make of evidence of uncharged offenses, specifically the rape of Raquel's cousin, Cassandra.[17] The trial court had no

_____

[17] Cherms argues CALCRIM No. 1191 as modified for this case should have stated:

" '[T]he People presented evidence that the defendant committed the crime of [forced sexual penetration] that was not charged in this case. This crime is defined for you in these instructions.

" 'You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

" 'If the People have not met this burden, you must disregard this evidence entirely.

" 'If you decide that the defendant committed the uncharged offense you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the offenses charged in counts one through six as charged here.

" 'If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of counts one through six. The People must still prove each charge beyond a reasonable doubt.

" 'Do not consider this evidence for any other purpose [except for the limited purpose of determining Raquel Doe's credibility].' "

37

sua sponte duty to give such an instruction, and neither defendant requested the instruction. The claim is therefore forfeited.

"Trial courts generally have no duty to instruct on the limited admissibility of evidence in the absence of a request. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1020.) Cherms recognizes this authority, and concedes that the defense requested no such instruction, but argues that this is the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Collie* (1981) 30 Cal.3d 43, 64.)

This was not an extraordinary case requiring the trial court to sua sponte give a limiting instruction. Raquel's testimony about the rape of her cousin, Cassandra, was not a dominant part of the evidence against Cherms or Wolfe. The dominant evidence against them was DNA evidence, plus the testimony of Raquel about what happened to her that night in the park. The challenged evidence was certainly no more prejudicial that the evidence that the defendants had raped Raquel, a developmentally disabled woman. The challenged evidence was also relevant, as the trial court found, to prove the defendants' planning and intent, and as the prosecutor argued, to show Raquel was able to tell the entire story of what happened.

This was not an extraordinary case requiring a sua sponte limiting instruction, and any claim on appeal that the instruction should have been given was forfeited by the defendants' failure to request the instruction.

## DISPOSITION

The case is remanded to the trial court for resentencing on count 4, but in all other respects the judgments are affirmed.

                   BLEASE    , Acting P. J.

We concur:

       NICHOLSON   , J.

       ROBIE      , J.